Opinion by
Beaver, J.,
The libel in this case charges the respondent with a violation of her marriage vows and names as co-respondent Thomas Ma-dine, who was in the employ of the libelant for a considerable period.
The case was tried at great length and with painstaking care in the court below. The testimony is very voluminous, covering over 2,000 printed pages in addition to the lithographed exhibits.
The opinion of the court below states the admitted facts of marriage, the condition of the family and the separation, which need not here be recounted. The trial judge also makes an analysis of the testimony in the case and upon this bases his reasons for refusing the prayer of the libelant.
The decree “And now, December 17, 1906, decree refused and proceedings dismissed at the cost of the libelant,” and the allegation that “The court erred in not mailing and entering a decree granting the libelant a divorce, a vinculo matrimonii, as against the appellee,” constitute the tenth and eleventh assignments of error.
The appellant’s counsel, in their argument, say: “We insist upon the errors set forth in the various assignments, but after all the principal question is the one that we have argued, that under all the evidence the libelant was entitled to the decree which he asked for.”
*25 This, of course, is the crucial question, and to it we have given careful heed, basing our conclusions upon a full consideration of all the evidence in the case.
This evidence is of two kinds. First, the testimony of servants employed in, and friends of, the family, familiar with the relations of the parties and the family life. With the exception of that of a single witness, this testimony is not only not convincing but is scarcely sufficient to arouse even a suspicion of improper relations between the respondent and the corespondent. If, as appears from all the testimony, the latter was called from the stable to the house to assist in certain parts of domestic service, such as the moving of heavy furniture, the turning of mattresses, etc., and if, as appears from the testimony of some witnesses, he was engaged in certain portions of domestic service which necessarily involved his presence in the house, and was accustomed to carry at least one of the children from the nursery to the carriage and vice versa, his frequent presence in the house is fully accounted for. This being so, the facts narrated by the witnesses, with the single exception already referred to, even if true and taken at the worst, cannot be construed into anything more than indiscretion and possibly a lack of womanly reserve and sensitiveness in the matter of dress, etc., in the presence of a servant.
And so the presence of the respondent in the stable is explained by her interest in her horses and in the general management of the stable, of which she seems to have had, in some respects at least, practical control.
The excepted witness, to whom reference has been made, is Susie Wagner. She was evidently a strongly prejudiced witness. It is impossible to read her testimony, even without seeing the witness, without reaching this conclusion. She was brought from Germany by the libelant and was met, on her arrival in New York, by him and his counsel. She not only states alleged facts, but in drawing inferences from them does so uniformly at the expense of the respondent. Her environment at the time of the trial, the explicit denial by the respondent and co-respondent of every material incriminating allegation, the statement made to the counsel of the respondent, steno- *26 graphically taken down at the time,. in .which she expressly admitted, in answer to the question, “You said you didn’t know anything bad about Mrs. Hartje, didn’t you?” she answered “Yes, sir,” together with other equally contradictory statements, all force the conviction that her testimony is to be, to say the least, received not only with great care but with suspicion and such well-founded doubt as to preclude a conclusion such as we are asked to deduce from it.
As to the second land of evidence, which is by far the most important, and which, if convincing, would almost necessarily preclude any other conclusion than that the facts, as stated in the libel, were true, we have given to it careful and painstaking consideration. The incriminating part of this evidence consists of many letters, alleged to have been written by the respondent to the co-respondent. Whether or not these letters are genuine is the serious question involved. Their authenticity is absolutely denied by both the respondent, who says she never wrote them, and by the co-respondent, who says he never received them. They were, however, in the trial, the subject of a mass of expert and other testimony which is commented upon at considerable length by the trial judge in his opinion.
The expert testimony is based largely upon two exhibits offered by the libelant, known as No. 6 and No. 35. The introduction of No. 6, although not in any particular unusual, is somewhat peculiar, in view of what followed. Nos. 1, 2, 3, 4 and 5, admittedly genuine, were declared by the respondent, who was upon the stand, as having been written by her. When No. 6 was produced, the question was asked: “I hand you a letter marked exhibit 6, addressed to 'My dear Susie,’ and I ask you if that is a letter written by you? A. Yes, sir. Do you want me to tell what is in this letter? Q. No, I can read the letter, Mrs. Hartje. You did have a servant named Susie? A. Yes, sir.” It will be observed at once that the witness had no special opportunity to examine or read the letter. This letter, so admitted, was made the standard of comparison with many that followed and is one of the focal points of discussion and contention in the case. Many of the experts say that the *27 hand which wrote No. 6 wrote the most of the letters alleged to have been written by the respondent to the co-respondent, which, if the fact were established, would almost inevitably lead to the conclusion that the charges contained in the libel were true. Subsequent to the admission of the letter and, when the respondent had an opportunity to examine it, she repudiated it as having been written by her, first, because it was not in her handwriting, and, secondly, because it contained more than was in the letter which she admitted she had written and sent to Susie Wagner.
Another exhibit, around which battle , fiercely raged, was No. 35. Both the communication itself and the circumstances attending its production are peculiar. It was alleged to have been written by the respondent and sent to the co-respondent. It was alleged to have been discovered in a pile of ashes or offal at the stable months after the separation of the libelant and the respondent and after the co-respondent had quitted the employ of the .libelant. It was in shreds or small pieces and was pasted together, certain parts being omitted — presumedly not found- — but enough of it remains to determine with sufficient clearness that it could scarcely have been written by an innocent woman to an innocent man. The respondent denies explicitly that she. ever wrote.it and the co-respondent, with equal emphasis, denies that he ever received it. It is written upon a broad side. It is evident that it was never folded. No evidence of any fold appears, either in the original which was exhibited to us or in the photograph which we have before us. The paper is of such texture as to exhibit the evidence of a folding, if it had been made. If written by the respondent and sent by her to the co-respondent, it must have been sent to him by the hands of a third person. It is not conceivable that this could have been done, without its having been folded. If the testimony,of the respondent and co-respondent is worthy of any credence whatever, if the simple circumstance to which we have alluded has any significance, if the testimony of those who are most familiar with the handwriting of the respondent has any value, it would seem as if the experts — and they are numerous — who testify that it was not written by the respond *28 ent, should be taken of such corroborative force as to make the question of the genuineness of this letter very doubtful. Certain it is that this to our mind is not established by the preponderance of evidence. We are not unmindful of the number, character, ability and reputation of the experts in handwriting who testify on behalf of the libelant as to the genuineness of exhibits Nos. 6 and 35, but their testimony is not more convincing than is that of those who testify on behalf of the respondent who reach a different conclusion.
No specially useful object will be attained by further details of discussion. Following the lines already indicated in what we have said in regard to these exhibits, we reach the conclusion that the allegations of the libel are not sustained by a preponderance of evidence. This it was clearly the duty of the libelant to do in such a way as to satisfy the trial judge in the court below, or to satisfy us upon re-examination of the whole case. The trial judge was not satisfied. We are not satisfied. And upon this branch of the case, therefore, we agree with the conclusion reached by the trial judge, for many of the reasons stated by him in his opinion dismissing the libel.
A number of questions, relating to the admissions of evidence, are raised by other assignments of error. We are unable to see, upon a careful examination of them, or of the testimony admitted or excluded, that they can in any way seriously affect the conclusion reached. For the most part they relate to the admission or rejection of evidence offered in rebuttal. This is always very largely a question within the discretion of the judge, even where it arises in the trial of a case before a jury. It becomes even more a matter of discretion when the case is tried before a judge who, by reason of his ability to weigh and determine the value of evidence, is not likely to be misled. So far as we can judge of the character and materiality of the offers of evidence which were excluded, taking them at their full value, so far as that can be ascertained from the offers themselves, we cannot see that they could have materially influenced the decision of the court, and, assuming all that is contained in the offers, so far as we can determine the value of *29 the testimony offered therein, it would not influence us in the conclusion which we have reached.
In the hearing of this case before us, it was fully, ably and elaborately argued, and to both oral and printed arguments we gave, and have given, the fullest consideration. We are indebted to counsel of both sides for the industry displayed in their printed arguments and for the ability manifested in the presentation of the case from every point of view.
We have not regarded it as desirable to traverse more fully the ground covered by the opinion of the trial judge in the court below, but have contented ourselves with giving very briefly some of the reasons which lead us to the conclusion reached by him in the final disposition of the case.
The decree of the court below, dismissing the libel, is hereby affirmed, the assignments of error are all overruled and the appeal is dismissed at the costs of the appellant.
After this case was argued here and the conclusion reached which is announced above, a petition was presented on behalf of the libelant, setting forth in detail certain alleged after-discovered evidence and praying this court “to assume original jurisdiction of the matter and to take such steps and make such orders for the taking of testimony in support of this petition as to the court shall seem meet,” and, in the event of our declining to do so, that we “suspend, consideration of the appeal now pending and remit the cause to the court below for the taking of such testimony.” In the answer filed by the respondent and on the argument upon the case as presented by the petition and answer, the power of this court to take the testimony or to remit the case to the court below for the taking thereof was distinctly admitted, so that for the purposes of this case it is not necessary for us to discuss this question.
Assuming, therefore, that we have the power to grant the prayer of the petitioner, as we do only for the purposes of this case, we dispose of it upon the contents of his petition and the accompanying exhibits, and of the answer thereto as filed by the respondent.
The petition is accompanied by the affidavit of the libelant, *30 but is not supported by any affidavits of witnesses as to what their testimony would be or as to the manner in which the alleged documentary evidence was procured.
Assuming that everything alleged in the petition can be shown, we have a mass of letters alleged to have been written by the respondent which, in effect, are only cumulative and which raise no new question, and some written by other persons which are wholly immaterial to the issue and can throw no light upon it. As to ' the alleged facts to be proved by the co-respondent, his testimony, if correctly represented in the petition, must necessarily start with a declaration which would utterly discredit him as a witness and would lead only to the elimination of his testimony already taken which, if done, would not, in our opinion, materially change the general aspect of the case and would not lead to any different result.
In this connection we have also considered the supplemental petition accompanied by the affidavits of the mother and sister of the alleged co-respondent, but can find nothing in it or them which leads us to change our conclusion or warrants us in granting the prayers of the petitioner.
The prayers of the several petitions for suspending the case for the purpose of taking additional testimony are denied.